**ASPEX EYEWEAR, INC. and Contour Optik, Inc., Plaintiffs**

v.

**ALTAIR EYEWEAR, INC., Defendant**

No. 02 Civ. 6195 SCR.

United States District Court,
S.D. New York.

April 2, 2007.

Brian G. Bodine, Kaustuv M. Das, Merchant & Gould, Seattle, WA and Edward J. Davis, Peter Karanjia, Davis Wright Tremaine LLP, New York City, for Defendant Altair Eyewear, Inc.

Jess M. Collen, Matthew C. Wagner, Jeffrey A. Lindenbaum, Collen IP, Town of Ossining, Westchester County, New York City, for Plaintiffs Aspex Eyewear, Inc. and Contour Optik, Inc.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. Background

Aspex Eyewear, Inc. and Contour Optik, Inc. ("Aspex" or "Plaintiffs") are suing Altair Eyewear, Inc. ("Altair" or "Defendant") for infringing several patents for detachable sunglass lenses. The sunglass lenses are attached to prescription glasses via magnets at the bridges of the glasses and the sunglass.

Defendant has three different product lines that use magnets to attach sunglass lenses to corrective eyewear: Diamontite Magnetics, Joseph Abboud, and Sunlites. While some of Defendant's Sunlite products contain a rim around the corrective lens portion of the glasses, none of Defendant's products contain a rim around the sunglass lenses. Instead, Defendant's lenses are set in what Defendant refers to as a "one-piece bridge" or a "three-piece mount." While Plaintiffs dispute this terminology, choosing, instead, to call all of the mounts "frames," this Court will use Defendant's terminology for the sake of clarity. The "three-piece mount" is comprised of lenses that are mounted, with pins, to a bridge and the earpieces. A "one-piece bridge" is simply the sunglass lenses mounted to the bridge with pins.

In either the one-piece bridge or the three-piece mount, holes are drilled through the lenses and pins extending from the components of the eyewear are inserted through those holes to mount the components to the lenses.

This Court has written two other opinions in this case. In March 2005, this Court denied Defendant's motion to dismiss the distributor as Plaintiff for lack of standing, and denied Plaintiffs' motion for leave to add Altair's parent corporation as a defendant. *See Aspex Eyewear, Inc. and Contour Optik, Inc. v. Altair Eyewear, Inc.*, 361 F.Supp.2d 210, 216, 217–18 (S.D.N.Y.2005). After holding a *Markman* claim construction hearing, *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd* 517 U.S. 370, 384–85, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), this Court decided the proper construction of the patent claims. *Aspex Eyewear, Inc. and Contour Optik, Inc. v. Altair Eyewear, Inc.*, 386 F.Supp.2d 526, 534 (S.D.N.Y.2005). Familiarity with those previous opinions is assumed here.

This opinion addresses the parties' cross-motions for summary judgment. Plaintiffs seek summary judgment on the issue of infringement of their three patents; Defendant seeks summary judgment on the issue of noninfringement of the same patents. Additionally, Plaintiffs have submitted two separate motions to exclude the testimony of two of Defendant's experts, Allen Leck and Ogden Webster. Defendant relied on Leck's opinion in its motion for summary judgment on the issue of noninfringement, and accordingly, this Court thus addresses Plaintiffs' motion to exclude Leck here. Because Defendant does not rely on Webster's opinion in the instant motion, however, it is not necessary for this Court to specifically address Plaintiffs' motion with respect to Webster. This Court does address the admissibility of the deposition testimony and affidavits the parties ask the Court to consider as the opinions of persons of ordinary skill in the relevant art.

For the reasons explained below, this Court grants Defendant's motions for summary judgment on the issue of noninfringement of the three patents and denies Plaintiffs' motions for summary judgment on the issue of infringement.

## II. Analysis

Courts use a two-step process to determine if a patent has been infringed. The court first interprets the claim to determine its scope and meaning. *See, e.g., Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394, 397 (Fed.Cir.1994); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796, 17 U.S.P.Q.2d 1097, 1099 (Fed.Cir.1990). This Court has already interpreted the claims here.[1] *Aspex Eyewear, Inc.*, 386 F.Supp.2d at 534.

---

1. This Court determined, *inter alia*, that "the term 'frame' includes some kind of rim surrounding the lenses.'" *Aspex Eyewear, Inc. and Contour Optik, Inc. v. Altair Eyewear, Inc.*, 386 F.Supp.2d 526, 534 (S.D.N.Y.2005). The diagrams and figures in the Patents–in–Suit contained "eyeglass devices that clearly include rims." *Id.* While courts "should not read limitations from the specification into the claim," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed.Cir.2005), the generalized disclaimers contained in the Patents–in–Suit did not require that "frames" be construed to include rimless varieties of glasses. *See Aspex Eyewear*, 386 F.Supp.2d at 535; (citing *Les Traitments Des Eaux Poseidon v. KWI, Inc.*, 135 F.Supp.2d 126, 135 (D.Mass.2001)); *see also Phillips*, 415 F.3d at 1315 (holding that the claim specifications are "highly relevant to the claim construction analysis"). This is because, in part, the claim stated that the function of the frames was to "support lenses therein." *See Aspex Eyewear*, 386 F.Supp.2d at 533, 534 (citing Claim 1 of the '054 patent, which described the "eyeglass device" as

■ In the second step to determine if a patent has been infringed, the court must decide if the accused device is within the scope of the properly construed claim. *See, e.g., Dolly, Inc.,* 16 F.3d at 397; *Becton Dickinson & Co.,* 922 F.2d at 796. To show infringement, the plaintiff must establish that the accused device includes every limitation of the claim or an equivalent of each limitation. *See, e.g., Dolly, Inc.,* 16 F.3d at 397; *Becton Dickinson & Co.,* 922 F.2d at 796.

### a. Summary Judgment Standard

■ . While the second step of patent infringement analysis is a question of fact, a court may grant summary judgment on non-infringement if no reasonable jury could find that every limitation of all of the asserted claims of the patents-in-suit is found in the accused products. *See Tech-Search, L.L.C. v. Intel Corp.,* 286 F.3d 1360, 1371–72 (Fed.Cir.2002). The party opposing the summary judgment must show either that the movant has not established its entitlement to judgment on the undisputed facts or that material issues of fact require resolution by trial. *Vivid Techs., Inc. v. American Science & Eng'g, Inc.,* 200 F.3d 795, 806–07 (Fed.Cir.1999). The plaintiff has the burden of proving that each and every element of the asserted patent claims is found in the accused device, either literally or by an equivalent. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991). A court must grant a motion for summary judgment "against a party who has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case, on which the party will bear the burden of proof at trial." *Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed.Cir.2001).

■ In deciding whether a genuine issue of material fact exists, the court must believe the evidence of the nonmovant and draw all justifiable inferences in the nonmovant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To defeat a motion for summary judgment, however,

comprising "a primary (respectively auxiliary) spectacle frame for supporting (respectively auxiliary) primary lenses therein".) After making the determination that "frames" required rims, this Court construed other terms consistently as requiring rimmed frames.

The claim construction determinations this Court made included the following:

1. **'054 Patent**
   a. *frame* means an eyeglass device that included, at least, a bridge and rims, and thus excluded rimless frames;
   b. *projection* means "any portion of the auxiliary bridge which extends toward the primary bridge for the purpose of going over and engaging with the primary bridge" and can also be a multi-component, bent or even U-shaped structure
2. **'811 Patent**
   a. *retaining mechanisms* is a means-plus-function claim within the meaning of § 112 ¶ 6 and means a structure that kept the lenses in place using rims, and

   b. *supporting a pair of lenses* means "holding the lenses in place using rims."
   c. *defining a frontal plane* means "delineating, by rims, the plane of glasses parallel to the lenses."
   d. *holding the two retaining mechanisms together* means "supporting, or keeping from falling, the rims together."
   e. *two frames are attached together* means "two eyeglass devices, which include, at least, a bridge and rims, are fastened or connected by magnetic attraction."
   f. *not parallel to the frontal plane* means "substantially perpendicular to the frontal plane" without any limitation that coupling occur on the top and bottom of surfaces of the bridge.
3. **'896 Patent**
   a. *a bridge configured to connect two retaining mechanisms and hold them together* means "the middle part of the eyeglasses spanning the nose designed to connect the rims."

the opposing party must offer more than "conclusory statements." *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112, 56 USPQ2d 1225, 1240 (Fed. Cir.2000). "The mere recital of the *Graver Tank* mantra that the accused device performs 'the same function, in the same way, to achieve the same result,' without more, does not create a genuine issue of material fact as to whether an accused device infringes by equivalents." *Id.* at 1113 (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). Thus, allegations that a defendant infringed a patent which are "entirely lacking in factual support" are insufficient to withstand a defendant's motion for summary judgment on non-infringement. *Id.* at 1112.

Here, the Court must apply three different tests to determine if Defendants have infringed Plaintiffs' patents. The first two tests are relevant for the '054 patent. First, a defendant can commit literal patent infringement if "the accused device or method performs an identical function to the one recited in the claim." *IMS Tech. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed.Cir.), *cert. dismissed* 530 U.S. 1299, 121 S.Ct. 24, 147 L.Ed.2d 1047 (2000) (citations omitted). Second, a defendant can infringe a patent under the doctrine of equivalents, explained below. *See id.* The third analysis, often referred to as the means-plus-function (or structure-plus-function) test, is used to determine if the '811 and '896 patents were infringed under 35 U.S.C. § 112 ¶ 6. *See id.* at 1430.

### b. Literal Infringement of '054 Patent

■■■ The accused device must "contain each limitation of the claim exactly" to literally infringe a patent. *Litton Sys., Inc. v. Honeywell Inc.*, 140 F.3d 1449, 1454 (Fed.Cir.1998). Any deviation from the claim prevents the court from finding literal infringement. *See id.* Whether an accused device literally infringes a claim is a question of fact. *See IMS Tech.*, 206 F.3d at 1429.

■■■ Defendant argues that, given the claim construction requirement that both primary and sunglasses frames contain rims, Defendant has not literally infringed Plaintiffs' patent. At oral argument, Plaintiffs conceded that in each of Defendant's devices, either the auxiliary or primary frame or both did not contain rims. As rims are a required element of each of the allegedly infringing devices, Defendant has not literally infringed Plaintiffs' '054 patent. *Litton Sys., Inc.*, 140 F.3d at 1454.

### c. Doctrine of Equivalents: '054 Patent

■■■ To infringe under the doctrine of equivalents, the differences between the patented device and the accused device must be "insubstantial." *Oak Tech., Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316, 1331 (Fed.Cir.2001). Whether an accused device or method infringes a claim under the doctrine of equivalents is a question of fact. *Seachange Int'l, Inc. v. C–Cor Inc.*, 413 F.3d 1361, 1429 (Fed.Cir.2005). As "equivalence [must] be evaluated from the perspective of one of ordinary skill in the art." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1357 (Fed. Cir.2004), this Court must first determine the admissibility of the parties' experts' testimony.

### i. Admissibility of Expert Testimony

The Federal Circuit has stated that where an evidentiary ruling raises a procedural issue that is not unique to patent law, the law of the regional circuit applies. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed.Cir.1999); *WMS*

*Gaming, Inc. v. International Game Technology,* 184 F.3d 1339, 1361 (Fed.Cir.1999). Because the admissibility of expert testimony is a procedural issue that arises in an array of substantive areas, Second Circuit law governs the admissibility of the experts' testimony in this case.

■■■ Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." The objective of the "gatekeeping" requirement of *Daubert* and Rule 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■■■ The trial judge's gatekeeping obligation applies not only to testimony based on "scientific" knowledge, as in *Daubert,* but also to testimony based on "technical" or "other specialized" knowledge.

*Id.* at 141, 119 S.Ct. 1167. The Court emphasized that the test for reliability is "flexible," *id.,* and stated that a trial judge may, but need not, consider the specific factors identified in *Daubert:*

(1) whether a theory or technique can be and has been tested;

(2) whether it has been subjected to peer review and publication;

(3) whether it has a high known or potential rate of error; and

(4) whether it is generally accepted in the relevant scientific community.

*Id.* at 149–50, 119 S.Ct. 1167 (citing *Daubert,* 509 U.S. at 592–94, 113 S.Ct. 2786). A district court should consider the Daubert factors "where they are reasonable measures of the reliability of expert testimony," *Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. The list of factors "neither necessarily nor exclusively applies to all experts or in every case," *id.* at 141, 119 S.Ct. 1167. Notably, the trial judge has "the same kind of latitude in deciding how to test an expert's reliability ... as it enjoys when it decides whether that expert's relevant testimony is reliable." *Id.* at 152, 119 S.Ct. 1167.

■■■ Pursuant to this framework, the first step in determining the admissibility of expert testimony is to examine "whether the proposed witness qualifies as an expert." *Baker v. Urban Outfitters, Inc.,* 254 F.Supp.2d 346, 352 (S.D.N.Y. 2003). The court is required to "decide whether the particular expert has specialized knowledge to assist ... 'in deciding the particular issue in the case.'" *Kumho,* 526 U.S. at 157, 119 S.Ct. 1167 (internal citation omitted). Next, the Court must determine "whether the scientific, technical or other specialized testimony provided by the expert is both relevant and reliable." *Baker,* 254 F.Supp.2d at 353.

■ Expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *see also Campbell ex rel. Campbell v. Metropolitan Property and Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir.2001). With respect to the issue of reliability, "[t]he district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.' " *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.2002) (quoting FED.R.EVID. 702).

■ An expert's "unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact." *Arthur A. Collins v. Northern Telecom Limited*, 216 F.3d 1042, 1046 (Fed.Cir.2000). Instead, the expert must include the facts upon which his conclusions were reached. *See id.; Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed.Cir.1999). An expert's statements that the critical claim limitation is found in the accused device will not preclude summary judgment unless the expert sets forth these "specific facts showing that there is a genuine need for trial." Fed. R.Civ.P. 56(e); *Arthur A. Collins*, 216 F.3d at 1047.

### 1. Allen Leck

■ Defendant seeks to admit the expert report of Allen Leck, who until recently was the President of Avantek Eyewear company.[2] Avantek focuses on developing technologies in the design and manufacture of ophthalmic frames and lenses. Leck thus claims that he is "skilled in the art" in the eyeglass and eyewear industry.

Plaintiffs do not contest that Leck has specialized knowledge. Plaintiffs instead contend that Leck is unreliable because he has historic ties with Defendant and Defendant's counsel "coached" him in preparing his report. Plaintiffs also argued that Leck did not review the patent file histories and should not have been permitted as an expert in the *Markman* hearing.

It is not unusual for counsel to discuss testimony and reports of a witness, even an expert witness, prior to their testimony. In fact, such consultation sharpens the witness's testimony and saves the court considerable time. Here, there is no evidence that the advance discussion and preparation of Leck went beyond what is normally expected and practiced in the federal courts. Since Leck's testimony did not go to the ultimate issue in this case (i.e. whether the patents were infringed), but instead regarded how various terms are used and interpreted in the industry, his failure to review the patent file history is not fatal to a determination of his viability and value as an expert witness in this case.

**2.** In addition to being the President of Avantek, Inc. from 2001 until 2005, Leck was the President of Primary Eyecare Network from 1989–2001. Primary Eyecare Network, whose membership included over one thousand doctors and seven hundred practitioners, was a management/buying group for independent optometrists that offered management/financial training, purchasing, staff training, and support services. From 1983–1989, Lent was the Vice President of Marketing and Sales/ Vice President of Sales for Coopervision, Inc.; before that, he was the Director of Marketing and Sales for Aquaflex Contact Lens Co. for two years. He began his career at Bausch and Lomb, Inc., where he worked in a variety of sales and product manager positions.

Plaintiffs have not alleged that Leck's opinion regarding the pins is not grounded on sufficient facts or data, or not the product of reliable principles and methods, or that Leck erred in applying otherwise reliable principles and methods. *Amorgianos*, 303 F.3d at 265. While Leck may have some attenuated ties to Defendant, such connections do not automatically disqualify his testimony. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed.Cir.1985) (holding that "[w]hile the opinion testimony of a party having a direct interest in the pending litigation is less persuasive than opinion testimony by a disinterested party, it cannot be disregarded for that reason alone and may be relied upon when sufficiently convincing"). Finally, it should be noted that the *Markman* hearing was completed in this case, and this Court did not consider Leck's testimony in that hearing. *Aspex Eyewear, Inc.*, 386 F.Supp.2d at 536 n. 4. In light of the above, this Court finds that Leck's opinion as "one of ordinary skill in the art" is admissible. *Lighting World, Inc.*, 382 F.3d at 1357.

## 2. Stephen Wright

■ Defendants submit the declaration of Stephen Wright, the President of Altair.[3] While Plaintiffs cite to Wright's deposition testimony in their motion for summary judgment, they discount Wright's declaration as that of a person who was "not disclosed as an expert or as one skilled in the art of eyewear."[4] Plaintiffs also argue that Wright's declaration contradicts his deposition testimony and, "lacks credibility." They do not, however, argue that he does not have specialized knowledge.

Defendant states that Wright is not testifying as an expert, but instead he is testifying as to facts or opinions that are rationally based on his perception and that such perceptions are helpful to the determination of the facts at issue. *See* Fed. R.Evid. 701; *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 296 n. 21 (Fed.Cir.1985). This Court will consider Wright's declaration as opinions. *See, e.g., Montefiore Medical Center v. American Protection Ins. Co.*, 226 F.Supp.2d 470, 473–474 (S.D.N.Y.2002). The fact that Wright's testimony in his deposition may contradict his declaration goes to the weight such testimony should be accorded, not to whether it is admissible or should be considered by this Court. Plaintiff may be correct that such contradictions lessen Wright's credibility, but that is a determination for the Court to make after reviewing his declaration. This Court finds that Wright has the requisite specialized knowledge, and his declaration is relevant. This Court holds that Wright's opinion is admissible as one of ordinary skill in the art.

## 3. David Chao

Plaintiffs seek to admit the declaration of David Chao, the co-inventor of the '811 and '896 patents and the Director of International Sales at Contour Optik.[5] Contour

---

**3.** Wright has been involved in many aspects of the eyewear industry during his thirty-two year career, and is responsible for all aspects of Altair's business.

**4.** Plaintiff states that Wright is "unqualified to speak of characteristics pertaining to equivalence of the accused product because he was not disclosed as an expert."

**5.** Chao has been employed by Contour since 1989 and became the Director of International Sales in 1996. He is also a shareholder and corporate officer of Contour. He graduated from the University of Maryland with a BA in 1988, and has designed eyewear since 1990. He is the sole or joint inventor on multiple patents in the magnetic eyewear field, including at least eight patents in Cana-

Optik designs, manufactures, and markets eyewear, including primary eyeglass frames with magnetic clip-on sunglasses, throughout the world. Like Wright, Chao was not disclosed as an expert witness. *Montefiore Medical Center*, 226 F.Supp.2d at 473–474. Nevertheless, Chao has the requisite specialized knowledge, and his declaration is both relevant and reliable.[6] This Court holds that Chao's opinion is admissible as one of ordinary skill in the art.

### 4. Harry F. Manbeck

■ Plaintiffs seek to admit the expert report of Harry F. Manbeck, a patent attorney who, prior to his involvement in this case, did not possess any particular expertise with respect to the eyeglass industry. Indeed, Manbeck admits that he "do[es] not consider [himself] to be a person of ordinary skill in the design of eyeglass frames." Manbeck Expert Report ¶ 5; Manbeck Dep. at 38:19–39:1. Thus, this Court declines to use Manbeck's opinion to determine if Altair infringes Aspex's patents under the doctrine of equivalents. *See, e.g., Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, No. 03 Civ. 8253(DLC), 2006 WL 44053, at *3–4, 2006 U.S. Dist. LEXIS 278, at *10–11 (S.D.N.Y. Jan. 9, 2006).

### ii. Analysis

■ To determine if the differences between the patented and allegedly infringing product are substantial, the court examines each element as "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997). Each element in the patent claim is "deemed material to defining the scope of the patented invention." *Id.* This "all elements rule" means that the doctrine of equivalents will not apply to a claim of patent infringement if applying the doctrine would "vitiate an entire claim limitation." *Seachange Int'l, Inc. v. C–COR Inc.*, 413 F.3d 1361, 1378 (Fed.Cir.2005). Given that the purpose of claims is to provide public notice of what the patentee claims as his invention, a court must not make a finding of equivalence if that finding "would conflict with the primacy of claims in defining the scope of the patentee's rights." *Sage Products v. Devon Indus.*, 126 F.3d 1420, 1424 (Fed.Cir.1997). If no reasonable jury could determine that two elements are equivalent, "district courts are obliged to grant partial or complete summary judgment" of noninfringement. *Sage Products*, 126 F.3d at 1423.

Courts have applied two different analyses to determine if the differences between the two devices are "insubstantial." One is a three-part "function-way-result test" that focuses "on the *function* served by a particular claim element, the *way* that element serves that function, and the *result* thus obtained by that element." *Warner–Jenkinson Co., Inc.*, 520 U.S. at 39, 117 S.Ct. 1040 (emphasis in original). The other is referred to as the "insubstantial differences test" and is a looser inquiry in which the court compares the two devices. *See id.*[7] This Court will apply the function-way-result test.

da, and twenty-five patents in the United States and other countries.

6. This Court received, and considered, additional briefing from Defendant regarding the admissibility of the Chao Declaration.

7. Plaintiffs argue for a more loosely-applied test, citing *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1518 (Fed.Cir. 1995). This case was reversed by *Warner–Jenkinson.* 520 U.S. at 29, 117 S.Ct. 1040.

The fact-finder must evaluate equivalence from the perspective of one of ordinary skill in the art. *Lighting World, Inc.*, 382 F.3d at 1357. Here, then, the parties put on dueling experts. Defendant argues, via Stephen Wright[8] and Allen Leck,[9] that the one-piece bridge and the three-piece mount are substantially different from "frames" because they lack the rims that surround lenses mounted in a frame. Plaintiff, via its expert and owner David Chao,[10] argues that the interchangeability of pins and rims is common in the eyewear industry.[11]

The hotly contested issue in this Court's *Markman* hearing was whether frames required rims. This Court held that frames do require rims. Whether "frames" are construed in the eyeglass industry to include "rimless frames" is not particularly relevant in this case. Here, the Court is called upon to determine if the pins in Defendant's rimless eyeglasses are substantially similar to the frames *as defined*

8. Wright states that there are significant difference between frames and either a one-piece bridge or a three-piece mount. First, the structure is different: in a frame, lenses are inserted into and contained within the rims of the frame. In a one-piece bridge or three-piece mount, holes are drilled through the lenses and pins are inserted through those hold to mount the one-piece bridge or the three-piece mount components to the lenses. This results in a weaker and less-durable mount than what would be provided if a frame was used. Also, the pins used to mount the lenses can be in the wearer's line of sight. Mounting lenses in a one-piece bridge and three-piece mount is more difficult and expensive than installing lenses in rims, as specialized machinery is required to drill holes in the lenses. If the holes are not drilled properly, the lenses can become cracked or loose. Finally, very thick lenses cannot be mounted using a three-piece mount. Wright claims one-piece bridges and/or three-piece mounts have several advantages, however. They are lighter than frames, and thus more comfortable for the wearer, and "more stylish and aesthetically pleasing" than frames as they are less conspicuous.

9. Leck states that while persons in the eyeglasses industry might refer to a three-piece mount or a one-piece bridge as a "rimless frame," the way that the term frame is defined in claim 1 of the '054 patent—as "a primary spectacle frame for supporting primary lenses therein" and "an auxiliary frame for supporting auxiliary lenses therein"—limits the definition of frame here. For eyeglasses frames to support lenses therein, they would necessarily have to include rims that surround the lenses, either entirely or partially along with the use of some form of lens-retaining wire.

10. Chao states that a spectacle "frame," in the eyewear industry, can include rimless frames, semi-rimless frames, and full frames. He states that rims are "interchangeable" with studs, pins, or screws, and that the lens mounting for rimless and rimmed eyewear is "essentially the same."

11. Plaintiffs also argue that Defendant's marketing of its patented product should be considered when deciding this case. This was a point Plaintiffs brought up during the claim construction hearing, and one that this Court again does not find relevant. *Aspex Eyewear, Inc.*, 386 F.Supp.2d at 536 n. 4. Plaintiffs state that the patent Defendant uses as a basis for the projects that Defendant seeks to differentiate as frameless describes eyewear that "magnetically attaches auxiliary eyeglasses to an eyeglasses frame." U.S. Patent No. 6,139, 141 ("'141 Patent"). Plaintiffs claim that by marking its packaging for both rimmed and rimless eyewear with the '141 Patent, Defendant should be somehow estopped from claiming that "frames" require rims.

The claim construction in the case before this Court related only to Plaintiffs' patents. Claim 1 of Plaintiffs' '054 patent, described the "eyeglass device" as comprising "a primary (respectively auxiliary) spectacle frame for supporting (respectively auxiliary) primary lenses *therein*". It does not appear that Defendant's '141 Patent requires that the frames contain "lenses therein." Thus, the scope of "frames" in Plaintiffs' '054 Patent appears to be simply narrower than the scope of "frames" in Defendant's '141 Patent.

*in Plaintiffs' patents* and as construed by this Court in the *Markman* hearing.

■ This Court will apply the function-way-results test. In the *Markman* hearing, this Court determined that, in Plaintiffs' '054 patent, frame means "an eyeglass device that included, at least, a bridge and rims." Plaintiffs' claim stated that the function of the frames was to "support lenses *therein.*" *See Aspex Eyewear,* 386 F.Supp.2d at 533, 534 (citing Claim 1 of the '054 patent, which described the "eyeglass device" as comprising "a primary (respectively auxiliary) spectacle frame for supporting (respectively auxiliary) primary lenses therein".) Pins do not support lenses "therein."

The function of the pins in Defendant's product is arguably similar to the function of the rims in Plaintiffs' product. However, the way in which these two devices perform that function differs. The frames encircle the lenses, holding them "therein," as specified in Plaintiffs' patent. Pins do not hold the lenses "therein." Instead, the pins pierce the lenses in several locations to attach them to the bridge and the earpieces. While, again, the results are arguable the same—the lenses are suspended before the wearer's eyes—the way these results are reached is different. As a result, pins are not substantially similar to rims. Applying the doctrine of equivalents would vitiate this claim limitation. *Seachange Int'l, Inc.,* 413 F.3d at 1378. Thus, the doctrine of equivalents does not apply, and Defendant's motion for summary judgment on the '054 patent is GRANTED.

### d. Means–Plus–Function Equivalency under § 112 ¶ 6: '811 and '896 Patents

■ As this Court explained in the claim construction order, "[m]eans-plus-function claiming applies only to purely functional limitations that do not provide

the structure that performs the recited function." *See Aspex Eyewear, Inc.,* 386 F.Supp.2d at 539 (citing *Watts v. XL Sys., Inc.,* 232 F.3d 877, 880–81 (Fed.Cir.2000)). A means-plus-function term covers, under 35 U.S.C. § 112, the "corresponding structure, material, or acts described in the specification and equivalents thereof." Section 112, ¶ 6 "protect[s] the substance of a patentee's right to exclude by preventing mere colorable differences or slight improvements from escaping infringement .... by holding as infringements equivalents that are beyond the literal scope of the claim." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,* 145 F.3d 1303, 1310 (Fed.Cir.1998). The Federal Circuit explained that "[c]laim construction of a § 112 ¶ 6 limitation includes identifying the claimed function and determining the corresponding structure or act disclosed in the specification, both of which are questions of law." *IMS Tech.,* 206 F.3d at 1430. Whether the device or method at issue performs the identical function with the same structure, materials, or acts described in the specification or an equivalent thereof, thus infringing a claim with a § 112 ¶ 6 limitations, is a question of fact. *See id.*

■ As in other tests for infringement, a claim limitation in a § 112, ¶ 6 analysis "must be met, literally or equivalently, for infringement to lie." *Odetics, Inc. v. Storage Technology Corp.,* 185 F.3d 1259, 1268 (Fed.Cir.1999). Unlike the component-by-component comparison in the doctrine of equivalents context, however, a court need not compare individual components of the overall structure. *Id.* Instead "the claim limitation is the overall structure corresponding to the claimed function." *Id.*

The Federal Circuit has applied two different approaches in the means-plus-function comparison. Plaintiffs argue for the

*IMS Technology* approach. In *IMS Technology*, the court compared the allegedly infringing device to the patented device by considering "the substantiality of their differences in the context of the claimed invention." *See IMS Tech.*, 206 F.3d at 1436–37. The court considered if the differences in the physical characteristics of the two devices were "important to the invention" by asking if the structures performed "the same function in substantially the same way to achieve substantially the same result." *Id.* at 1437.[12] If the "disclosed physical structure is of little or no importance to the claimed invention, there may be a broader range of equivalent structures than if the physical characteristics are critical in performing the claimed function in the context of the claimed invention." *Id.* at 1435.

Defendant argues the Court should apply the test used in *Kemco Sales.* In *Kemco Sales,* the Federal Circuit required the allegedly infringing device to either be identical to the patented device or to be "equivalent" under § 112 ¶ 6: "(1) perform the identical function and (2) be otherwise insubstantially different with respect to structure." *Kemco Sales, Inc. v. Control Papers Co., Inc.,* 208 F.3d 1352, 1364 (Fed. Cir.2000).

■■■■ Defendants prevail under either *Kemco* or *IMS Technology* because the structure they use to attach lenses to their glasses differs substantially from structure of the Plaintiffs' retaining mechanisms.

The parties agree that comparison should be made between (a) the retaining mechanism in the patents-in-suit, (b) rims, and (c) the pins in the accused device. This Court construed "retaining mechanisms" in Plaintiffs' '811 and '896 Patents to be a means-plus-function term meaning "a structure that keeps the lens in place using rims." *Aspex Eyewear, Inc.,* 386 F.Supp.2d at 540. In the claim construction, this Court explained that the function of the "retaining mechanism" is to "support[ ] a pair of lenses and defin[e] a frontal plane." *Id.* at 539. Also relevant to this analysis is the phrase "defining a frontal plane," which was construed to mean "delineating, by rims, the plane of glasses parallel to the lenses." *Id.* (noting that " 'defining a frontal plane' also clearly describes a function of the 'retaining mechanisms' "). The claim construction also continued to define "frames" as requiring at least a bridge and rims.[13]

Defendant points out that each claim that requires "retaining mechanisms" also requires frames. In terms of the retaining mechanism itself, Defendant states that one of the functions of the retaining mechanism was to define the plane, and that was a crucial feature that allowed Plaintiffs to distinguish their '811 and '896 Patents from the prior art. Defendants argue that the frontal plane defined by Plaintiffs' retaining mechanisms was important because the magnetic coupling in the '811

**12.** The invention in *IMS Technology* was an apparatus that permitted interactive programming of a machine tool. *See id.* The element in question was the "interface means" used to store the programs created using that programming apparatus. *See id.* The patented product used a tape cassette transport; the accused product used a floppy disc drive. *See id.* The Federal Circuit vacated the grant of summary judgment of noninfringement because the plaintiff "provided some evidence of structural similarity" between the two devices

and determined that the substantiality of those differences was an issue of fact "in light of the role played by the 'interface means' in the claimed invention." *See id*

**13.** Other terms defined in the claim construction need not be considered here as this Court finds dispositive the lack of means-plus-function equivalency under § 112 ¶ 6 for the retaining mechanism.

and '896 Patents differed from the magnetic coupling in a prior third-party patent in that it occurred at a surface *not* in the frontal plane. Defendant argues that given the importance of the "retaining mechanism" in defining the frontal plane and, thus, the plane in which the magnetic members are coupled[, the pins do not meet the means-plus-function equivalency test in § 1 12 ¶ 6.

Defendant also argues that the way in which the pins fulfill the function of retaining the lenses is different: rims perform their "retaining mechanism" function by supporting the lenses in the frame. Pins pass through holes drilled in the lenses. Thus, even if the supporting-and-defining-the-frontal-plane functions of the "retaining mechanism" were performed the same way with pins and frames, there is no infringement under § 112 ¶ 6 because the way in which those functions are performed is different.

Plaintiffs argue that even under frames-include-rims claim construction, the pins are equivalent to the rims disclosed in its '811 and '896 patents since they perform the same function, and they "are clearly of little or no importance to the claimed invention." Plaintiffs argue that the retaining mechanism merely provides a means for securing the lenses to the bridges. In the context of the invention, Plaintiffs state that the retaining mechanism is less important to the novel feature—a bridge-mounted magnetic system that is capable of being secured with one hand by the wearer. Even under *Kemco*, Plaintiffs argue, the patents are infringed as the pins perform the identical function as rims: they keep the lens in place and secure the lenses to the bridge. The Plaintiffs argue that the structure of the pins is equivalent to that of rims.

In *Chiuminatta*, the Federal Circuit held that the accused device did not have a structure that was equivalent to the structure in the means-plus-function clause, which provided for a "means connected to the saw for supporting the surface of the concrete." 145 F.3d at 1306. The function of the means clause was to "support[ ] the surface of the concrete adjacent to the leading edge of the cutting blade to inhibit chipping, spalling, or cracking of the concrete surface during cutting." *Id.* at 1308. The structure was a skid plate, "a generally flat hard plate that straddles the leading edge of the cutting blade." *Id.* at 1309. The allegedly infringing product used wheels that rotated rather than a flat plate that skidded. *Id.* Finding that "the differences between the wheels and the skid plate [were] not insubstantial," the Federal Circuit upheld a district court's grant of Defendant's motion for summary judgment. *Id.*

■■■ If there is "indisputable mechanical incompatibility" between the patented device and the allegedly infringing device, there is no infringement. *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1375 (Fed.Cir. 2004). In *Frank's Casing*, there was a substantial difference between the raising and lowering mechanisms in the patented and the raising and lowering mechanisms in the accused devices. *Id.* While the two hydraulic cylinders at issue "perform[ed] essentially the same function," they "represent[ed] two distinct structural approaches" to performing that function. *Id.* As a result, there was no infringement.

In *Odetics*, in contrast, pins in the infringing structure were the equivalent of the gear in the patented structure as they "perform[ed] the identical function in the same way" by "receiv[ing] the force necessary to accomplish the 'rotary' function."

185 F.3d at 1271.[14] The patented structure rotated because force was exerted against the teeth of the gear, which then turned the bin about the rod, and the accused device rotated because force was exerted against the cam followers, which also turned the bin about the rod. *Id.* at 1269–70. Thus, the *way* that structures accomplish the claimed rotary function, and the *result* of that function were substantially equivalent. *Id.* at 1270. Finally, the gear and pins were actually interchangeable. *Id.* As a result, the device containing the "bin array" infringed the patented device containing "rotary means." *Id.*

This Court finds that even if the pins in Defendant's one-piece bridge and three-piece mount perform the identical function as the "retaining mechanisms" in the Plaintiffs' patent, their structure differs substantially from the structure of Plaintiffs' retaining mechanism. Plaintiffs' retaining mechanisms keep the rims in place using rims that encircle the lenses. Defendant's one-piece bridge and three-piece mounts, instead, have pins inserted through the lenses. Under either *Kemco* or *IMS* test, Defendants prevail because the structure they use to attach lenses to their glasses differs substantially from the structure of the Plaintiffs' retaining mechanisms.

Here, the patented retaining mechanism is a "structure that keeps the lenses in place using rims." The function is to keep the lenses in place. The structure supports lenses holding them in place using rims. The rims encircle the lenses to keep them in place. Pins in the allegedly infringing structure keep the lenses in place, but do so by piercing the lenses and attaching them to the bridge and the earpieces. Like the skid plate and the rotating wheel in *Chiuminatta*, the structure of the rims and the pins differs substantially. 145 F.3d at 1309. While the rims and the pins "perform essentially the same function," they "represent two distinct structural approaches" to performing that function. *Frank's Casing Crew & Rental Tools*, 389 F.3d at 1375. No reasonable factfinder could find that the rims in the '811 and '896 patents and the pins in Defendant's one-piece mounts and three-piece bridges are substantially equivalent because the way these structures accomplish the claimed function is different. *Odetics*, 185 F.3d at 1270. Thus, there is no infringement under § 112 ¶ 6. *Id.*

Furthermore, this Court determined that pins were not insubstantially different from rims and, thus, granted Defendants motion for summary judgment on the '054 patent for both literal infringement and infringement under the doctrine of equivalents. The '811 and '896 patents also require "frames," which are defined in the same way as they were in the '054 patent. For the reasons explained in the '054 patent, pins and rims are not "insubstantially different with respect to structure," *Kemco Sales, Inc.*, 208 F.3d at 1364, and, thus, there is no literal infringement under § 112 ¶ 6 even if they have the same function. No reasonable factfinder could find

---

**14.** In *Odetics*, the structure corresponding to the means-plus-function "rotary means" element was "the components that receive the force and rotate as a result of that force (*i.e.*, the rod, gear, and rotary loading and loading mechanisms)." *Odetics, Inc.*, 185 F.3d at 1264. Thus, the patented "rotary means" element was a set of tape holders or bins, a rod that provided the axis of rotation, and a gear that received the force necessary to accomplish the rotation function. *Id.* at 1265. The allegedly infringing element was a "bin array" composed of a set of tape holders or bins, a rod that formed the axis of the bin array, and pins that were affixed to the bottom of the bin array that received the force necessary to rotate the structure. *Id.* at 1265.

that the Defendant's products are equivalent to Plaintiffs' because of these limitations. *Chiuminatta*, 145 F.3d at 1309 (holding that summary judgment is appropriate if "no reasonable jury could have found that the accused device has an equivalent to the disclosed structure").

Having found that there is no infringement under § 112 ¶ 6, there is no need to determine if there is infringement of the '811 and '896 patents under the doctrine of equivalents. *Chiuminatta*, 145 F.3d at 1311 (holding that where the issue of equivalence involves "technology that predates the invention ... a finding of non-equivalence for § 112, ¶ 6, purposes should preclude a contrary finding under the doctrine of equivalents"). Finally, because several claim limitations are missing from the accused products, there can be no infringement of any of the dependant claims. *See, e.g., Jeneric/Pentron, Inc. v. Dillon Company, Inc.*, 205 F.3d 1377, 1383 (Fed.Cir.2000). Thus, this Court grants Defendant's motion for summary judgment on the issue of noninfringement of the '811 and '896 patents.

### III.  Conclusion

Plaintiffs' motions for summary judgment on the issue of infringement of the '054, '811, and '896 patents are DENIED, as is Plaintiffs' motion to exclude the testimony Allen Leck. Defendant's motions for summary judgment on the issue of noninfringement of the '054, '811, and '896 patents are GRANTED.

All outstanding motions on the docket for this case are hereby terminated, and the Clerk of the Court is directed to close this case.

IT IS SO ORDERED.