# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| ANHAM FZCO, LLC | ) ASBCA No. 59283 |
| | ) |
| Under Contract No. SPM300-10-D-3373 | ) |

APPEARANCE FOR THE APPELLANT:          Eric J. Marcotte, Esq.
                                        Vedder Price P.C.
                                        Washington, DC

APPEARANCES FOR THE GOVERNMENT:         Daniel K. Poling, Esq.
                                          DLA Chief Trial Attorney
                                        John F. Basiak Jr., Esq.
                                        Keith J. Feigenbaum, Esq.
                                        Theodore E. Lorenz, Esq.
                                          Trial Attorneys
                                        DLA Troop Support
                                        Philadelphia, PA

## DECISION BY ADMINISTRATIVE JUDGE KINNER ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The government moves for summary judgment to deny the appeal of ANHAM FZCO, LLC. The motion was filed 8 February 2017. Appellant filed its opposition 17 March and the government replied 17 April. For the reasons stated below we deny the government's motion for summary judgment.

## STATEMENT OF FACTS FOR PURPOSES OF THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

On 14 April 2010, ANHAM FZCO, LLC (ANHAM) was awarded an indefinite-quantity contract to procure, store and distribute food and non-food items to the military and other federal customers in Kuwait, Iraq and Jordan (R4, tab 1 at 47, tab 27 at 1). The contract was awarded and administered by the Defense Supply Center Philadelphia (DSCP), now called the Defense Logistics Agency – Troop Support (DLATS) (R4, tab 27). In the contract ANHAM assumed the role of Prime Vendor responsible for management of the food inventory. Management of the inventory included a requirement to maintain a 45-day supply ready for distribution to federal customers. ANHAM was also responsible for forecasting the monthly demand from the troops in the war zone. Although the government is only required to order the specified minimum quantity in an indefinite-quantity contract, the federal customers surpassed that amount in this contract. (R4, tab 1 at 47-48)

The contract required food to be purchased in the United States. Once it reached the Middle East, ANHAM stored food in warehouses in Kuwait. To maintain appropriate inventory levels, ANHAM needed to maintain a flow of food to the Kuwait warehouses from American suppliers. This was accomplished through an extended "pipeline" beginning with trucks transporting food to warehouses in the United States, then to ports. Ships transported the food to Kuwait and trucks brought the food to ANHAM's warehouses before distribution by truck to troops in Iraq. (R4, tab 14 at 12)

During the solicitation process potential offerors were concerned with the possible withdrawal of American troops from Iraq. The President had made many public statements about his intention to withdraw troops (e.g. app. opp'n, ex. C). If the contract was terminated prematurely it was possible that the contractor would not recoup the significant costs that would be incurred (app. opp'n, ex. A ¶ 11, ex. B at 275). The attendees at the 14 May 2008 pre-proposal conference expressed these concerns. Amendment No. 0003 added the transcript of bidder questions from the conference to the solicitation. Question number 12 in the conference asked:

> The White House administration will change after the
> November elections, and this solicitation is "all at risk".
> What steps will DSCP take to mitigate PV losses if troops
> are withdrawn? Will this loss mitigation include repayment
> for facilities constructed in anticipation of contract award?
> Will it cover PV products stocked in support of this massive
> requirement? This will amount to hundreds of millions of
> dollars.
> **Ans.: 1) Draw down period; 2) No, this contract has a
> guaranteed minimum and that is all that the
> Government is required to order and pay for under the
> contract; 3) Again, draw down period will exhaust
> pipeline product[.]**

(R4, tab 3 at 20) Question number 124 at the conference asked:

> Page 34: Notification to extend contract 3 days? What are
> we supposed to do with our buildings, personnel assets and
> on the water pipeline of supplies if 3 days prior to the 1st
> option periods or any period we are terminated?
> **Ans.: DSCP will provide notice of intent 60 days prior to
> the expiration of a performance period. This does not
> guarantee that the government will exercise the option.
> With regard to buildings, personnel assets and on the
> water pipeline of supplies, the government provides a
> contract minimum and the contractor assumes the risk.**

> **We anticipate that a ramp down period will mitigate risk.**

(*Id.* at 33) Question number 134 at the conference asked:

> Page 70: If the Democratic candidate wins the election in November 2008 and they pull the troops out of the Middle East—what happens to our assets, warehouse, personnel and products in house and in the pipeline? 1 percent guaranteed?
>
> **Ans.: There are too many assumptions here. If a troop pull-out were to occur, DSCP would develop a ramp down/exit strategy. The minimum contract value remains at 1%.**

(*Id.* at 35) The amendment stated that the **"[t]he answers in Section II are provided for clarification purposes only and do not change the requirements in the solicitation"** (*id.* at 2).

Shortly after receiving award of the contract, ANHAM entered a service agreement with Jassim Al Wazzan Sons General Trading Co., W.L.L. (Wazzan) for lease of a warehouse in Kuwait, known as the Logistica warehouse (app. opp'n, ex. A; R4, tabs 25, 72). That agreement had a term of 18 months with a 6-month extension provision. The initial term of the agreement would expire 31 December 2011 (app. opp'n at 9, ¶ 18).

In November 2008, during the final year of President Bush's term, the United States entered a Status of Forces Agreement (SOFA) with Iraq. The SOFA was effective as of 1 January 2009. It established that American troops would leave the country by 31 December 2011. The SOFA caused DLATS to amend the solicitation on 29 May 2009 to reduce the term of the contract. Amendment No. 0018 to the solicitation changed the base period of the contract to 18 months and established 4 one-year options. (R4, tab 14) Notwithstanding the existing SOFA, it was not until 21 October 2011 that President Obama finalized the decision that no United States troops would remain in Iraq in 2012 (gov't mot. at 11, ¶ 40).

Before the withdrawal decision was finalized, ANHAM became concerned about the impending drawdown of troops (app. opp'n, ex. A; R4, tab 54). But in June 2011, DLATS encouraged ANHAM to plan to feed at Thanksgiving and Christmas the same number of troops it fed earlier in the year (am. compl. ¶ 24). Later, in September, ANHAM proposed to reduce its available warehouse assets or have the government pay for the storage space. DLATS did not support ANHAM's proposed reduction. Instead, DLATS advised ANHAM that it had to maintain its resources for full performance of the contract. Contrary to that advice, food orders dropped significantly in October and

3

drastically fell in November and December. (*Id.* ¶¶ 28-29) The government does not challenge ANHAM's allegations that DLA encouraged planning for significant troop levels in the final months of 2011.

United States troops were completely withdrawn from Iraq by 18 December 2011. ANHAM had shipments of food in its pipeline at that time. ANHAM had also renewed the lease for its largest warehouse in Kuwait until 30 June 2013 (am. compl. ¶ 31). ANHAM submitted a claim on 28 August 2013 to the DLATS contracting officer for $10,989,020 which it allegedly incurred for lease of the warehouse between 1 January 2012 and 15 January 2013 (am. compl. ¶ 39). DLATS denied the claim. ANHAM filed its complaint 23 July 2015. DLATS filed its answer to the complaint 20 May 2016.

The answer asserted six affirmative defenses (answer at 34, ¶¶ 1-22). First, DLATS alleges that the claim is barred by the Sovereign Acts Doctrine because it characterizes ANHAM's claim as seeking costs resulting from the government's decisions concerning military troop movements or classification of such information. Second, DLATS asserts the claim is barred by the Political Question Doctrine because the claim concerns wartime decisions by the President. Third, DLATS argues appellant's claim should be dismissed because it assumed the risk that events in an active war zone could increase its costs. Fourth, DLATS asserts that ANHAM waived its right to pursue this claim because it renewed the lease that caused its increased costs. Fifth, DLATS claims ANHAM's claim is barred because it failed to mitigate its damages. Sixth, DLATS alleges that the representation in ANHAM's proposal that the warehouse was leased for the duration of the contract was inaccurate which it asserts is a material breach by ANHAM that excuses it from liability.

## DECISION

### A. Standard of Review for Summary Judgment

We look to Rule 56 of the Federal Rules of Civil Procedure for guidance in deciding motions for summary judgment. Board Rule 7(c)(2). It is settled law that summary judgment will be granted where (1) the material facts are undisputed and (2) the moving party is entitled to judgment as a matter of law. The moving party has the burden of demonstrating both elements. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000). Here the government has failed to establish its entitlement to summary judgment on either element.

### B. Disputes of Material Facts Preclude Summary Judgment

The government asserts in its motion that it is entitled to summary judgment because there are no disputed issues of material fact. It relies upon a recitation of facts that are similar to the facts alleged in ANHAM's complaint. (Gov't mot. at 2-12) But the government's statement of facts differs significantly from appellant's allegations

4

because it does not address ANHAM's allegations that DLATS actively misled the contractor regarding the impending departure of United States Armed Forces from Iraq. Specifically, ANHAM alleges in its complaint that DLATS insisted throughout 2011 that it possessed no information concerning plans for the withdrawal of American troops from Iraq. ANHAM claims such representations by DLATS were untruthful because the government had established a military departure date in an operational order issued 6 January 2011, OPORD 11-01 (app. opp'n at 10, ¶ 22). That order directed the removal of troops from Iraq in 2011. ANHAM also claims that DLATS was aware the operational order was amended in May 2011 to narrow the period in which troops would be withdrawn to 14 October to 18 December 2011 (app. opp'n at 11, ¶ 25). ANHAM alleges DLATS withheld that information and instead informed ANHAM that plans had not been established for a drawdown of troops (*id.* at 11-12, ¶¶ 26-27). ANHAM further alleges that DLATS knowingly encouraged it to use incorrect troop estimates when planning for food stocks through 2011 (*id.* at 12-13, ¶¶ 29-30, at 15-16, ¶¶ 36-40, at 18, ¶ 42, at 21, ¶ 48).

As required, ANHAM's opposition does not merely rely upon its complaint. The party opposing summary judgment cannot rest upon allegations in its pleadings, but must respond by affidavits or otherwise, setting forth specific facts to show the existence of a genuine issue for trial. *Adamation, Inc.*, ASBCA No. 22495, 80-1 BCA ¶ 14,385. ANHAM's allegations are supported by documents in the Rule 4 file (e.g. R4, tabs 48-72), documents submitted with its opposition (app. opp'n, exs. B-F, H-J) and the affidavit of Beau Lendman, the senior vice president of the company (app. opp'n, ex. A). These allegations identify disputed material facts that preclude summary judgment.

Notwithstanding these disputed facts DLATS requests summary judgment. The gravamen of ANHAM's claim is that the government was aware that it was withdrawing its personnel from Iraq by the end of 2011, but kept this knowledge from ANHAM, thus violating its contractual duty of good faith and fair dealing. DLATS asserts that ANHAM's claim should be denied for three reasons. First it assumed the risk that troops could be withdrawn. Second, it suffered no damages. Third its claim is barred by the Sovereign Acts Doctrine. According, to the government the Board may consider these arguments and disregard ANHAM's allegations of DLATS' misrepresentations discussed above. DLATS asserts ANHAM's allegations should be ignored because the operational order was classified and troop level estimates are irrelevant. More specifically, DLATS argues that its actual knowledge of how many troops ANHAM had to be prepared to feed is irrelevant. According to DLATS, its actions are irrelevant because ANHAM renewed the warehouse lease which is the subject of its claim three months before the President's final agreement regarding a continuing presence of United States troops in Iraq. DLATS also asserts troop projections are irrelevant because ANHAM was already aware of the SOFA which precluded troops remaining in Iraq past 31 December 2011 and Amendment No. 0018 of the solicitation had reduced contract requirements in response to the SOFA.

The government does not specifically address allegations that DLATS personnel knowingly misrepresented information about the planned withdrawal and purposefully encouraged ANHAM to rely upon false troop estimates. DLATS does not attempt to justify withholding information from the contractor. Nor does it justify its statements misleading the contractor about the plan to withdraw troops in 2011. The government, instead, unsuccessfully attempts to evade the point of ANHAM's claim.

DLATS cannot ignore the obvious relevance of information it possessed regarding the number of troops in Iraq, classified or not. Depriving the contractor of access to that information would undermine ANHAM's ability to perform the contract. It was ANHAM's responsibility to formulate an estimate of the number of people to be fed every month. It based its food inventory on these estimates. If DLATS advised use of inflated estimates it could cause ANHAM to project higher demand, causing increased costs in procurement, shipping and storage. This is precisely ANHAM's claim—that DLATS's misrepresentations caused it to extend the warehouse lease.

> DLATS' direction that ordering had to be based on current troop strength, rather than projections, would also impede moving to a smaller warehouse. Thus, ANHAM had no choice but to exercise an extension of the Logistica warehouse lease.

(Am. compl. ¶ 31)

ANHAM further alleges that the operational order had established a specific plan to leave Iraq by the middle of December (am. compl. ¶¶ 8-9). To the extent that DLATS's representations to ANHAM during performance conflict with the existence, or the contents, of OPORD 11-1 it is relevant and material to ANHAM's claim. If DLATS urged ANHAM to use false troop projections, either in conflict with OPORD 11-1, or to support it, those facts are material and relevant. The parties' dispute concerning DLATS access to the plan to withdraw troops in December 2011 prevents consideration of summary judgment.

The government's description of the SOFA as the public plan for troop withdrawal is a similarly disputed material fact. The SOFA did not establish a definitive plan upon which ANHAM could base troop projections. DLATS's actions in 2011 demonstrate ANHAM could not rely upon the SOFA. ANHAM learned that the SOFA was meaningless for planning purposes from DLATS's insistence there was no plan for troop withdrawal. ANHAM claims it was consistently informed by DLATS in 2011 that there was no established plan for troop withdrawal from Iraq (am. compl. ¶¶ 20, 23-24, 26, 29, 31). DLATS again confirms this in its reply. In 2017 DLATS still argues that "a decision by President Obama to withdraw troops from Iraq was not made until mid-October 2011" (gov't reply at 8). DLATS also asserts that during 2011 ANHAM knew "the United States might withdraw all troops from Iraq by December 2011, and might not" (*id.* at 9).

6

Contrary to the fact statement in the government's motion, the SOFA did not provide ANHAM knowledge to counteract misrepresentations by DLATS.

The government argues alternatively that ANHAM's claim seeks the same costs it recovered through regular contract payments. It claims ANHAM was paid the cost of the warehouse as part of the contract's normal distribution price (gov't reply at 2). But the government produced no proof of such payments or how the payments covered costs for warehousing excess inventory. DLATS does not explain how payments ANHAM received during contract performance for procurement and distribution of food would also account for the storage cost of excess food beyond the amounts necessary during performance. This is especially unclear in light of the government's separate reimbursement to ANHAM after the contract for the cost of the excess inventory accumulated in the final months of 2011 as well as the cost of destruction of that inventory (*id.*).

Rather than support summary judgment, these arguments establish that the facts material to ANHAM's claim are in dispute. As the party opposing a motion for summary judgment, ANHAM is to be given the benefit of all reasonable doubt in determining whether a genuine factual issue exists. *Adamation*, 80-1 BCA ¶ 14,385. ANHAM controverts the central premise of the government's motion. DLATS's motion primarily rests upon an allegation that ANHAM assumed the risk that troops might leave while it had food stored in its warehouse. The government supports that argument with ANHAM's proposal in which it describes and accepts the risk of a major withdrawal of troops (gov't mot. at 21-26). But the government's determination to remove troops from Iraq is not the premise of ANHAM's claim. ANHAM claims that its assumption of risk in this contract did not include assuming the risk of government misinformation. Assuming ANHAM's allegations to be true for the purposes of the government's motion, the contractor had no basis to assume that DLATS's representations regarding troop withdrawal were false. ANHAM could reasonably assume that the government, as its contracting partner, would not purposely mislead it. ANHAM was responsible for formulating monthly projections of the number of federal personnel it would feed. Information regarding troop disposition was a critical component of such estimates. Misrepresentations by DLATS of facts pertaining to government plans to withdraw troops from Iraq would undermine ANHAM's ability to form reliable projections of federal personnel to be fed in coming months. Thus, ANHAM alleges it relied upon the misinformation provided by the government. Its allegations can be fairly read to also assert that the government intended the contractor to rely upon the false troop projections provided by DLATS.

It is likely that ANHAM relied upon DLATS's misinformation because it contradicted available public information. DLATS's allegations regarding the President's desires to withdraw troops from Iraq, and even that he entered the SOFA promising to do so, do not deflect ANHAM's allegations. ANHAM has provided evidence that, in discussions concerning troop levels DLATS showed complete

disregard for the SOFA. Contrary to that agreement, DLATS urged ANHAM to plan for 80,000 troops in November. Contrary to the agreement, DLATS advised ANHAM to prepare for the same level of personnel late in 2011 as it had been serving earlier in the year. DLATS confirms this in its motion. DLATS asserts that there was widely held public knowledge that the United States and Iraq "were in high-level discussions to possibly keep some troops in Iraq beyond December 2011" (gov't mot. at 10, ¶ 36). It argues that, up to the final agreement with Iraq, the President was negotiating whether troops would remain in Iraq in 2012 (gov't reply at 8). Thus, the SOFA was disregarded by DLATS and the President was allegedly working contrary to its terms. In that environment, the public information available to ANHAM regarding the President's intentions was little more than talk.

DLATS further argues that ANHAM's reliance upon the statements made by DLATS and recorded in Amendment No. 0003 of the solicitation is misplaced (gov't reply at 1). DLATS asserts the information in Amendment No. 0003 is irrelevant because the amendment stated it was for clarification only and did not change the requirements of the solicitation. The statements in Amendment No. 0003 are also allegedly irrelevant because that discussion pertained to troop levels throughout the Middle East, encompassing Jordan and Kuwait, not exclusively Iraq. DLATS also argues that the questions at the pre-proposal conference were "expressly *not* incorporated into the Solicitation or Contract." (Gov't reply at 2) Contrary to DLATS's characterization, ANHAM argues that the representations at the conference were incorporated into the contract (app. opp'n at 31). ANHAM supports its argument with citation to the copy of the contract in the Rule 4 file at tab 27. On page 2 of that exhibit, the contract provides that the solicitation, the amendments to the solicitation and ANHAM's proposals are incorporated into the contract. Also contrary to DLATS's argument, it is not clear from the text of Amendment No. 0003 that the government's expectations for a drawdown period applied only to zones outside Iraq. Only one of the three statements in which DLATS predicts a drawdown period refers to the wider Middle East. Nor is it clear that government references to a future ramp down of troops is a change to the requirements of the solicitation.

These and other disputed material facts prevent consideration of summary judgment on this record.

### C. DLATS Requests Summary Judgment on Three Theories.

#### 1. The Contract did Not Shift Risk of Misrepresentation onto the Contractor.

By its motion, DLATS makes the same misrepresentations to the Board that it made to ANHAM during performance. The government recognizes in its motion that ANHAM claims that DLATS breached the implied duty of good faith and fair dealing by withholding information regarding the withdrawal of United States forces from Iraq.

8

The government nonetheless claims it is entitled to judgment as a matter of law because ANHAM assumed the risk of troop withdrawals. DLATS claims ANHAM was aware of widely disseminated public information that the government was pursuing an agreement for troop withdrawal and no one, including DLATS, knew until October 2011 whether troops would remain in Iraq. DLATS represents that the agency was unaware early in 2011 of internal plans to ensure the complete withdrawal of American troops from Iraq. DLATS claims it could not violate its duty to cooperate with ANHAM because it simply did not possess information with which it could mislead the contractor. DLATS goes so far as to claim informing ANHAM in July or September 2011 that all troops would be out of Iraq in December would have been "a risky wild guess" (gov't reply at 8). This assertion is not merely contrary to ANHAM's allegations, it is baseless.

ANHAM's claim that it was misled by DLATS is based upon the issuance of OPORD 11-1. It claims that DLATS possessed precise knowledge of the planned precipitous drop in "mouths to feed" between October and December 2011 (app. opp'n, ex. A). Specifically, the military was directed in May 2011 by amendment to OPORD 11-1 to prepare for and execute withdrawal of all troops by 18 December 2011, including a drastic reduction of troops beginning 14 October. DLATS does not attempt to refute ANHAM's allegations. DLATS apparently believes it can ignore allegations pertaining to OPORD 11-1. This is similar to DLATS's assertions to ANHAM during the contract. It would like to be considered ignorant of the plans to withdraw troops from Iraq in 2011. Perhaps it believes this feigned ignorance is somehow persuasive in litigation as well. It is not.

As noted above, ANHAM supports its allegations with documents in the Rule 4 file, other external documents and the affidavit of its senior vice president. The correspondence shows DLATS insisted ANHAM maintain the peak level of provisions through the end of 2011, contrary to the planned withdrawal of troops (app. opp'n, ex. F). As late as September 2011, the contracting officer informed ANHAM that the agency "has yet to receive official information available for public release regarding the reduction of personnel in Iraq and Kuwait" (R4, tab 72 at 52). Following that, the contracting officer specifically encouraged ANHAM to utilize inflated projections of troops to be fed through 2011 and into 2012 (app. opp'n, ex. A ¶ 24).

This evidence is sufficient to establish a prima facie case of breach of the duty of good faith and fair dealing by DLATS. The government's plan to withdraw troops was vital information for the contractor to plan and execute its performance through 2011. ANHAM did not assume the risk that the government would withhold or falsify information regarding the troops to be fed in October, November and December of 2011. Having assumed the contractual obligation to formulate troop projections and maintain food inventory based on the projections, ANHAM necessarily asked the government for information to make its projections as accurate as possible. If the government responded with false information it would have acted to specifically

9

undermine the contractor's ability to obtain the fruits of the contract within the terms of the bargain.

This contract, like other contracts, implicitly contains a covenant of good faith and fair dealing. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). The covenant imposes on each party a "duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Lakeshore Eng'g Servs., Inc. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014). The duty is found within the context of the contract to ensure neither party acts inconsistent with the contract's purpose or deprives the other party of the contemplated value. *Metcalf Constr.*, 742 F.3d at 991. The government's motion disregards these principles when it argues that the contract limits its exposure to ANHAM's costs. The government cannot rely upon its limited obligations in the Indefinite-Quantity clause to preclude recovery by ANHAM (gov't mot. at 27). The Indefinite-Quantity clause does not shield DLATS from its obligation of good faith in performance. *John McCabe*, ASBCA No. 36958, 89-2 BCA ¶ 21,857. In that clause, ANHAM agreed that the government may exercise its discretion to limit the amount of business it will do and it will not be liable for purchases beyond that amount. Thus, the contractor agreed to cede determination of the scope of the contract to the government's discretion. In doing so, it did not also surrender the government's compliance with other contractual obligations. Case law uniformly recognizes that contract provisions that grant the government discretion are accompanied by an implied obligation not to abuse that discretion and to act in good faith. *Id.* at 109,948 (citing *Monarch Enterprises, Inc.*, ASBCA No. 31375, 86-3 BCA ¶ 19,227 at 97,224). Here, ANHAM claims the government failed to act in good faith when it purposefully thwarted the contractor's ability to formulate troop projections. It further claims that DLATS's misrepresentations deprived ANHAM of the means of contract performance and the ability to protect itself from unreasonable increased costs.

The purpose of this contract was for ANHAM to act as the Prime Vendor to federal customers in Iraq, Kuwait and Jordan for the supply and delivery of food and non-food items (gov't mot. at 2, 4). This responsibility included inventory management which required ANHAM to determine the monthly demands and maintain a 45-day supply in its warehouse (*id.* at 5). With those responsibilities, ANHAM assumed the risk that decisions regarding troop deployment could result in unrecovered costs (*id.*). It is evident that ANHAM's ability to manage that risk would depend upon its skill in inventory management which logically required the best assessment of demand possible. It does not appear that the government was obligated to assist in the assessment of demand. Thus, the nature of the bargain placed on ANHAM the burden of determining the amount of food to stock in its warehouse and the risk that it could overstock at its cost if demand decreased.

Assuming the risk of forecasting demand, ANHAM could not reasonably expect the government to assist in determination of troop levels. But, ANHAM could reasonably

10

expect the government not to interfere in its monthly determinations. Contrary to that reasonable expectation, ANHAM has provided evidence that the government advised it to use inflated troop estimates when planning food demand in the final months of 2011. In doing so, the government failed to act in good faith. Good faith in contractual relations means "honesty in fact in the conduct or transaction concerned." *McCabe*, 89-2 BCA ¶ 21,857 at 109,948. The government's alleged actions fail that standard even if it could offer a legitimate legal basis for withholding or misrepresenting this information. The mere lawfulness of conduct by public officials does not preclude a tribunal from finding that such conduct still violates standards of decency, fairness or reasonableness. *J.A. Jones Constr. Co.*, ASBCA No. 43344, 96-2 BCA ¶ 28,517. Accordingly, drawing all justifiable inferences in favor of the party opposing summary judgment, we conclude that appellant has raised sufficient issues regarding the government's good faith and fair dealing in performance of the contract to withstand summary judgment and entitle it to a trial on the merits.

2. The Government Offers No Evidence to Support its Presumption that ANHAM has No Compensable Damages.

The government argues that it is entitled to summary judgment because ANHAM represented in its proposal that it had retained the warehouse that is the subject of its claim for the entire length of the contract. DLATS claims that if ANHAM had initiated a lease for the contract period it would not have incurred damages because its warehouse costs would be covered as part of regular contract payments (gov't mot. at 26). DLATS further asserts that ANHAM did not need to execute an extension of its agreement to lease when it did. ANHAM's decision was allegedly premature because the lease extension was not required before the end of September 2011. DLATS insists that if ANHAM's agreement to lease the warehouse covered the exact period of the contract "there would have never been an issue about the Logistica lease expiring on December 31, 2011 and its alleged damages would have been *zero*." (Gov't mot. at 28)

When faced with the decision whether to renew the warehouse lease, DLATS argues ANHAM had two options to mitigate its costs (gov't mot. at 29). ANHAM could have sought a three-month extension of the warehouse lease which would have aligned it with the contract. Or, ANHAM could have obtained the six-month extension which was already available in its agreement with Wazzan. That extension would have gone only three-months longer than the contract. According to ANHAM, this is a Hobson's choice. Neither option would have accommodated the excess inventory procured pursuant to DLATS's false predictions. Thus, DLATS's argument is incorrect because it is misdirected. The claim is not premised upon ANHAM's alleged difficulty with its decision to renew its agreement with Wazzan. ANHAM claims the misrepresentation by DLATS of projected troop levels at the end of 2011 and beyond caused the need for continued warehouse storage. ANHAM argues that the significant volume of excess food required warehouse storage until 13 September 2013 (app. opp'n

11

at 46; R4, tab 72 at 68-71). Accepting that allegation as true, DLATS's argument for summary judgment fails.

### 3. ANHAM's Claim is Not Presumptively Barred by the Sovereign Acts Doctrine.

DLA asserts entitlement to summary judgment because ANHAM's contract claim is barred by the Sovereign Acts Doctrine. The sovereign acts defense is an inherent element of every contract to which the government is a party, whether or not explicitly stated. The government retains in every contract the authority to act as sovereign unless it surrenders this right in "unmistakable terms." *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993). In this case, as DLATS argues, the United States' determination to withdraw troops from Iraq pursuant to an agreement with the government of Iraq is a sovereign act. But, that fact alone may not bar the claim. As described above, ANHAM's complaint does not claim entitlement to compensation because there was a decision that troops would be withdrawn. ANHAM's claim is that DLA's withholding of information regarding that decision was contrary to its contract bargain. Concealing the plan to remove troops from Iraq deprived ANHAM of the ability to manage the inventory and facilities it is obligated to maintain under the contract.

The information ANHAM claims DLATS withheld was the specific military direction regarding the departure of troops from Iraq. As discussed above, ANHAM asserts that OPORD 11-01 explicitly established a date on which troops would leave Iraq (am. compl. at 5-6, ¶¶ 18-9; app. opp'n at 10-12). DLATS's motion and reply are silent regarding ANHAM's arguments regarding OPORD 11-01. This may be DLATS's attempt to avoid discussion of that document based upon its security classification. Failing to address the classification of OPORD 11-01, or to assert its classification as a sovereign act, does not support its motion. There is no basis for DLATS's failure to respond to ANHAM's arguments about the order or its discovery requests. DLATS's motion does not provide any reason for withholding information regarding the number of troops to be fed in the ending months of the contract. The government has apparently reserved those arguments for a hearing. Also, having included this point as an affirmative defense in its answer, it tacitly acknowledges that it must carry the burden of proof. DLATS does not to meet that burden on summary judgment.

And DLATS did not try in its motion to prove that a sovereign act prevented compliance with its duty not to interfere with the contractor. Rather it presents its sovereign act defense as a *fait accompli* that warrants dismissal of ANHAM's complaint. DLATS overstates this defense. At this point of discovery, it's not nearly so accomplished. Even if the sovereign acts defense applies, "it does not necessarily mandate dismissal." *Carabetta Enters., Inc. v. United States,* 482 F.3d 1360, 1365 (Fed. Cir. 2007) (quoting *United States v. Winstar,* 518 U.S. 839, 895 (1996)). The government is excused

from performance under the sovereign acts defense only when the sovereign act renders the government's performance impossible. *Casitas Municipal Water Dist. v. United States*, 543 F.3d 1276, 1287 (Fed. Cir. 2008). The classification of OPORD 11-01 does not establish that it was impossible for DLA to cooperate with ANHAM's contract performance.

DLATS's presumption that the mere presence of a sovereign act results in dismissal is based upon its reading of *Robertson & Penn, Inc. d/b/a Cusseta Laundry, Inc.*, ASBCA No. 55625, 08-2 BCA ¶ 33,951. In that case the contractor was to supply laundry services to military camps but the invasion of Iraq sharply reduced the amount of services required in the camps. If that case is similar to this one, the similarity stops there. In *Robertson*, the contractor claimed the government negligently estimated the amount of laundry that would be done because it knew the troops would be deployed away from the camps. The contractor's claim went further to blame the deployment itself as a basis for entitlement to additional compensation. The Board rejected that particular argument because the troop deployment was a sovereign act for which the government is not liable in the context of the contract. That is not the nature of the claim here.

*Am. Gen. Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 is a more analogous decision. Although also a negligent estimate claim, in that case the Board separated the question of the government's reasonable care in estimating requirements from the fact that those requirements might have been driven one way or another by potential sovereign acts. The troop deployment that affected the laundry in *Am. Gen. Trading* did not eliminate the government's obligation to exercise reasonable care to estimate its requirements. If the contractor could show that the government knew, or should have known, that the invasion of Iraq was imminent, and as a result its laundry estimate for the camps was wrong, the government would be liable for the breach resulting from that misrepresentation. The government's error would be its failure to take into account a sovereign act. Based on that, the Board held that the sovereign act defense did not apply to the contractor's negligent estimate claim.

That is the result here. The sovereign act defense does not apply to ANHAM's fair dealing claim because the government's liability, if any, arises from DLATS's failure to disclose information needed by the contractor. As in *Am. Gen. Trading*, whether the government reasonably provided or withheld troop estimates from ANHAM is a different question than whether those estimates might have been driven one way or another by potential sovereign acts. ANHAM should have an opportunity to demonstrate whether DLATS withheld its knowledge of the planned troop withdrawal.

13

## CONCLUSION

The government's motion for summary judgment is denied. The government has not established entitlement to summary judgment because material facts remain in dispute and it is not entitled to judgment as a matter of law.

Dated: 20 July 2017

DONALD E. KINNER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur (see separate opinion)

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

14

## OPINION BY ADMINISTRATIVE JUDGE SHACKLEFORD

I concur in the result because I agree that there are disputed material facts that preclude summary judgment. I also concur in the examination and rejection of the government's argument with respect to Sovereign Acts because that argument does not depend upon the existence or nonexistence of disputed material facts.

The remainder of the opinion which analyzed several arguments to determine whether the government could be entitled to judgment as a matter of law (were there no material disputed facts) is *obiter dicta* and unnecessary to the results. I do not join in that discussion.

Dated: 20 July 2017

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59283, Appeal of ANHAM FZCO, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15